**RACEWAY PARK, INC.**

v.

**ANSTED et al.**

Toledo Municipal Court,
Lucas County, Ohio.

No. CVF–97–11515.

Decided Sept. 24, 1999.

*Jack M. Lenavitt,* for plaintiff Raceway Park, Inc.

*Gregory J. LaVelle,* for defendants Shawn Ansted et al.

Thomas J. Osowik, Judge.

The complaint alleges that the various defendants between 1994 and 1996 were employed by the plaintiff as mutuel tellers. The complaint further alleges that

these defendants were overpaid for their duties as mutuel tellers and, therefore, the plaintiff seeks reimbursements.

The defendants and the intervenor admit employment during the period described in the complaint and further allege that wage payments to the defendants were governed by the terms of the collective bargaining agreement.

The plaintiff moves to dismiss the defendants' counterclaims, citing the United States District Court's opinion in *Raceway Park, Inc. v. Serv. Emp. Internatl. Union, Local 47*. In case No. 96–CV–7773, which was subsequently affirmed by the Sixth Circuit Court of Appeals in *Raceway Park, Inc. v. Serv. Emp. Internatl. Union, Local 47* (C.A.6, 1999), 167 F.3d 953, the federal district court found that Local 47 had exceeded the time limit established by the collective bargaining agreement for notifying Raceway of its desire to proceed to arbitration on the issue of wage payments.

The decision of the federal district court was appealed to the Sixth Circuit United States Court of Appeals. That court, with substantial reservations, affirmed the decision of the district court.

The opinion of the appellate court is helpful in providing a background synopsis of the conflict between the parties. The court stated in *Raceway Park, Inc. v. Serv. Emp. Internatl. Union, Local 47*, at pages 954 to 956 of the opinion:

## "BACKGROUND

"Raceway operates Raceway Park in Toledo, Ohio, which hosts actual on-site horse races, otherwise known as either 'live races' or 'races on the track.' Parimutuel wagering is conducted on both 'live races' at the Park and on horse races run at other race tracks nationwide which are televised (simulcast) at Raceway Park. Until the end of 1995, the State of Ohio, with some limited exceptions, had permitted parimutuel betting only on horse races conducted within the State of Ohio. In September 1996, however, the Ohio Legislature passed a bill permitting racetracks in Ohio, such as Raceway Park, to accept parimutuel wagering on horse races conducted nationwide. The format for such wagering, known as 'Full Card Simulcasting,' allows race tracks within the State of Ohio to increase their revenue substantially by allowing wagering on some of the top horse races around the country.

"Patrons at Raceway Park purchase and cash in wagering tickets issued from machines operated by employees of the track known as mutuel clerks. At all times pertinent to this action, Local 47 was the bargaining representative for Plaintiff's employees. On February 10, 1994, Raceway and Local 47 entered into a collective bargaining agreement. During the negotiations for the collective bargaining agreement, which is effective until December 31, 1998, Raceway

agreed to pay mutuel clerks a base rate salary of thirty-five dollars and fifty cents ($35.50) per day based on ten races per day. For every race beyond ten in a day, Raceway agreed that mutuel clerks were to be paid one additional bonus dollar for each additional 'live' race 'on the track.' As Schedule A to the collective bargaining agreement makes clear: 'One Dollar ($1.00) shall be added to the base rate for each live race thereafter on any one daily card.' In addition, on February 10, 1994, the parties also signed a Letter of Understanding, which provided, in pertinent part: 'It is further agreed that for purposes of the 1994 Contract, any televised race received by Raceway Park at 5700 Telegraph Rd. with parimutuel betting shall be counted as a race on the track for purposes of determining base rate.'

"The Ohio Legislature's decision in September 1996 to allow parimutuel betting on horse races run nationwide and televised in Ohio caused the current rift between the parties with respect to the wages paid to Local 47 members working at Raceway Park. It is not difficult to see why. After the law was changed, Raceway Park could take bets on well over one hundred races per night, the overwhelming majority of which were national races simulcast at the track for the mere purpose of taking wagers. Although Local 47 members working as mutuel clerks must now process bets on a significantly greater number of races, the Letter of Understanding signed by both parties states that such races are only to be counted as 'live races' or 'races on the track' for the purpose of determining base rate pay. That is, Local 47 employees do not receive the additional $1.00 per race bonus for every race beyond the first ten races of the evening, even though they have to process bets on those races.

"As a result of this new law, officials of both Raceway and Local 47 met on September 18, September 20, and October 9, 1996 to discuss the full effect that Full Card Simulcasting would have on wages paid to Local 47 employees. Raceway realized that a change in the collective bargaining agreement was necessary due to the fact that it was not compensating employees for the additional televised races that Full Card Simulcasting brought to the track. At the September 20, 1996 meeting, Local 47 produced a written grievance concerning the effect that Full Card Simulcasting has on wages. This grievance was presented to Raceway due to Local 47's apparent concern that the language of the collective bargaining agreement required a grievance to be filed within 48 hours after it arose. On two occasions, Raceway agreed to extend the 48–hour deadline, first to September 19 and then to October 20, 1996.

"On October 9, 1996, both parties met face-to-face for the last time to discuss Full Card Simulcasting and its effects on wages. This meeting proved futile. On October 17, 1996, Local 47 again presented its written grievance to Raceway's general manager, seeking to enforce the terms of the collective bargaining

agreement as written. The grievance was not resolved. Article V of the parties' collective bargaining agreement governs their official grievance procedures. It provides:

" 'ARTICLE V.   GRIEVANCE AND ARBITRATION PROCEDURE

" '5.1.   If there are any grievances by an employee or any differences or dispute of any kind or character between the Employer and the Union, involving the interpretation or application of the provisions of this Agreement and/or any work rules promulgated by the Employer, such grievance, difference or dispute shall be handled in the following manner:

" '(A).   The aggrieved employee and/or a representative of the Union shall, within forty-eight (48) hours after the grievance has arisen, or after the employee became aware of such grievance, discuss the matter with the Mutuel Manager or his designated representative.

" '(B).   If no agreement is reached within twenty-four (24) hours after such discussion, the matter shall be referred in writing to the General Manager of the Employer and shall be discussed by him or her and/or his or her designated representative and the aggrieved employee and/or his or her Union representative within twenty-four (24) hours.

" '(C).   If the dispute is not then resolved the Union may submit the dispute to its Executive Committee of the bargaining unit who at its next regular meeting, shall determine whether or not to submit the matter to binding arbitration. Unless the Union serves written notice via Certified Mail on the Employer within thirty (30) days after the completion of the meeting referred to in Paragraph (B), above, of its intent to seek binding arbitration, then in such event, all parties shall be barred from ever submitting such grievance, dispute or disagreement to arbitration.   Such written notice shall set forth all issues to be considered. Three local attorneys will be picked for the purpose of arbitration.   One by the Employer, one by the Union, and a third impartial attorney.

" 'The decision and award of the arbitration shall be final and binding on all parties.   The authority of the arbitrators shall be limited to the interpretation and application of the terms and provisions of the Agreement.   They shall have no right, power or authority to amend, change or modify this Agreement.   Their expenses shall be borne equally by the parties.'   See Agreement By and Between Raceway & Local 47 at 3, J.A. 13.

"On November 20, 1996, Local 47 notified Raceway of its desire to proceed to arbitration for an interpretation of the express provisions of the collective bargaining agreement related to the base rate of pay.   Raceway refused to proceed to arbitration on the grounds that Local 47 had exceeded the time limit

established by the collective bargaining agreement for notifying Raceway of its desire to proceed to arbitration.

"On December 16, 1996, Raceway filed a declaratory judgment action in the U.S. District Court for the Northern District of Ohio, seeking a declaration that 'issues of wages per hour in their agreement with [Local 47] are not subject to arbitration and are binding on plaintiffs and defendants until the agreement expires on December 31, 1998.' Compl. ¶ 9. The district court had federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the Labor Management Relations Act, 29 U.S.C. § 185.[1] Nowhere in the Complaint did Raceway allege that Local 47's grievance was procedurally defective. Local 47 answered the Complaint and filed a Counterclaim to compel Raceway to arbitrate the grievance concerning its alleged violation of Schedule A and the Letter of Understanding to the collective bargaining agreement. Raceway filed an Answer to the Counterclaim. Both parties then filed Motions for Summary Judgment. On September 22, 1997, the district court granted Raceway's Motion for Summary Judgment and denied Local 47's motion. [Footnote *sic*.]

"The district court's limited analysis focused on the timing of Local 47's arbitration demand. The court stated:

" 'In this case, the Union made its arbitration demand on November 20, 1996, thirty-four days after filing its grievance, and forty-two days after the final meeting between the Union and the Racetrack. The Union does not deny in any of its pleadings that its arbitration demand was untimely. Since the Union failed to demand binding arbitration within thirty days after meeting with the Race-track, it is forever barred from demanding arbitration by the terms of the CBA.' Memorandum Op. at 4 (Sept. 22, 1997)."

In the case before this court, the issues are identical. The question remains whether the defendants were overpaid wages pursuant to the terms of a collective bargaining agreement.

Federal courts of appeals continue to acknowledge that procedural arbitrability questions are to be determined by arbitrators, not judges. *John Wiley & Sons, Inc. v. Livingston* (1964), 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898.

The Supreme Court has recognized that "procedural arbitrability claims frequently raise equitable issues that are particularly suited to arbitral determina-

---

1. "Section 301(a) of the Labor Management Relations Act of 1947 provides:

" 'Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.' "

tion and are often inextricably intertwined with the merits of the underlying contractual dispute." *Raceway Park, Inc. v. Local 47*, 167 F.3d at 960.

" 'Questions concerning the procedural prerequisites to arbitration do not arise in a vacuum; they develop in the context of an actual dispute about the rights of the parties to the contract or those covered by it.' " *Raceway Park, Inc. v. Local 47, id.* at 960, quoting *John Wiley & Sons, Inc.*, 376 U.S. at 556–557, 84 S.Ct. at 917–918, 11 L.Ed.2d at 908–909.

The court decided that procedural matters should be left to arbitral resolution.

Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration.

The United States Sixth Circuit Court of Appeals in *Raceway Park, Inc. v. Local 47*, stated, lamentably:

"The First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and D.C. Circuits have applied *John Wiley & Sons'* sensible conclusion that the issue of whether a union's failure timely to satisfy the notice requirement of its intent to arbitrate is one of procedural arbitrability." *Id.* at 962.

In *Raceway*, the Sixth Circuit Court of Appeals, in affirming the district court's decision that held that the union's arbitration demand was forever barred, stated:

"Were this panel free to ignore the prudential limitations which prevent us from reversing an earlier decision of this Court, we would reverse the judgment of the district court and remand for entry of an order directing the parties to submit the grievance to arbitration in accordance with the terms of the collective bargaining agreement." *Id.* at 963.

Fortunately, this court is not bound by such prudential limitations.

Given the well-articulated reasoning of the United States Sixth Circuit Court of Appeals in its opinion in *Raceway* as to why the district court should have referred the dispute to arbitration, this court finds the defendants' motion for summary judgment to be well taken in part, and refers this matter to arbitration pursuant to ARTICLE V of the collective bargaining agreement.

The plaintiff's motion to dismiss the defendants' counterclaim is also found not well taken and denied based upon the same reasoning.

It is therefore ordered that both the plaintiff and defendants submit this matter to arbitration in accordance with Article V, Section 5 of the collective bargaining agreement entered into on February 10, 1994, attached hereto and incorporated as part of the order herein. See Appendix A.

It is further ordered that the parties select their respective arbitrators no later than October 22, 1999.

This case shall be continued for further review by the court on November 18, 1999, with all parties and their counsel to be present.

*Judgment accordingly.*

## APPENDIX A
### ARTICLE V.   GRIEVANCE AND ARBITRATION PROCEDURE

5.1.   If there are any grievances by an employee or any differences or dispute of any kind or character between the Employer and the Union, involving the interpretation or application of the provisions of this Agreement and/or any work rules promulgated by the Employer, such grievance, difference or dispute shall be handled in the following manner:

(A).   The aggrieved employee and/or a representative of the Union shall, within forty-eight (48) hours after the grievance has arisen, or after the employee became aware of such grievance, discuss the matter with the Mutuel Manager or his designated representative.

(B).   If no agreement is reached within twenty-four (24) hours after such discussion, the matter shall be referred in writing to the General Manager of the Employer and shall be discussed by him or her and/or his or her designated representative and the aggrieved employee and/or his or her Union representative within twenty-four (24) hours.

(C).   If the dispute is not then resolved the Union may submit the dispute to its Executive Committee of the bargaining unit who at its next regular meeting, shall determine whether or not to submit the matter to binding arbitration. Unless the Union serves written notice via Certified Mail on the Employer within thirty (30) days after the completion of the meeting referred to in Paragraph (B), above, of its intent to seek binding arbitration, then in such event, all parties shall be barred from ever submitting such grievance, dispute or disagreement to arbitration.   Such written notice shall set forth all issues to be considered. Three local attorneys will be picked for the purpose of arbitration.   One by the Employer, one by the Union, and a third impartial attorney.

The decision and award of the arbitration shall be final and binding on all parties.   The authority of the arbitrators shall be limited to the interpretation and application of the terms and provisions of the Agreement.   They shall have no right, power or authority to amend, change or modify this Agreement.   Their expenses shall be borne equally by the parties.